IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

MORO AIRCRAFT LEASING, INC.,

       Plaintiff,      Case No. 3:10 CV 2708

 -vs-

                 MEMORANDUM OPINION

JOHN L. KEITH, etc., et al.,

       Defendant.

KATZ, J.

  This matter is before the Court on motions to dismiss filed *pro se* by defendants Jon Keith (Doc. 7), Phil Walton (Doc. 8), and Clarendon Development Holdings, Inc. (Doc. 9) ("Clarendon"). Plaintiff, Moro Aircraft Leasing, Inc. ("Moro"), has filed responses to Keith's (Doc. 12) and Walton's (Doc. 15) motions. In addition, Plaintiff moves to strike Clarendon's motion to dismiss and Clarendon's Answer to defendant Lorena Harvey's cross-claims. (Doc. Nos. 10 & 20)

  Plaintiff's motions to strike will be granted. Walton's motion will be granted in part, and the claims against him will be dismissed without prejudice for lack of personal jurisdiction. Keith's motion will be granted in part, and the Court will order that the claims against him be arbitrated.

**I. Background**

  According to the Complaint, the allegations of which are assumed to be true at this stage of the litigation, in 2009 Moro began looking for sources of financing to purchase new airplanes to expand its business. A representative of Moro, Ward Rosadiuk, contacted Keith, who worked for defendant Corporate Lending & Corporate Leasing Services, Inc., which was in the business of arranging loans for "Private Air Charter Funding" and "Jets and Turbines." After several

discussions and the exchange of documents, Keith put Rosadiuk in touch with Clarendon and its President, Walton, who sent a 'letter of offer' to Moro for financing of three aircraft.

On August 24, 2009, Keith emailed a proposed Funding Agreement to Moro. Rosadiuk executed the agreement on behalf of Moro on October 9, 2009. Walton signed the agreement on behalf of Clarendon on October 10. The Funding Agreement, which is attached to the Complaint as Exhibit S, called for Moro to post collateral in the amount of $510,000, in the form of a standby letter of credit to be issued in favor of the Administrator, defendant Watson & Watson, PC, a law firm, by a 'top international bank.' In exchange, Clarendon would provide funding to Moro in the amount of $6,000,000.

On October 18, 2009 the parties executed an amendment to the Funding Agreement that provided that, in lieu of a standby letter of credit, Moro would transfer $510,000 to the Swiss bank account of defendant Stephan M. Hirter, an attorney. The transferred sum would be refunded when the first tranche of the loan proceeds were disbursed. The amendment also provided that the Administrator would send $400,000 to Moro's bank account within twelve days. On October 23, 2009 Rosadiuk wired the $510,000 to Hirter's bank account. On October 26, 2009 Rosadiuk provided Defendants with copies of its business license, articles of incorporation, by-laws, certificate of good standing, and biennial report.

On October 29, 2009 Walton requested additional documents from Moro, and advised that Defendants would transfer $100,000 to Moro on November 5, 2009, with an additional $300,000 to be sent no later than November 10, 2009. The remaining disbursement would occur pursuant to the terms of the Funding Agreement. On November 6, 2009 Walton indicated that the transfer was "on its way." But no funds were released. Later in November, Rosadiuk arranged a meeting with

2

Walton in Miami, but Walton never arrived. Rosadiuk received numerous assurances from Walton and others at Clarendon that the money would be disbursed, but it never was. On December 17, 2009, Rosadiuk requested that if the $400,000 was not transferred to Moro's account by that Friday, that the $510,000 collateral posted by Moro be returned. Later in December, Rosadiuk had two teleconferences with Walton and other Defendants during which they represented that Moro would receive the funding on its loan on January 7, 2010. They said that if Moro did not agree to this, they would use all of the collateral on administrative charges. Moro reluctantly agreed to the new date, and withdrew its request for a return of the collateral.

But the money was not disbursed on January 7. On January 14, 2010, Rosadiuk renewed Moro's request for a return of the collateral funds. Despite more assurances, no funds were disbursed, and the collateral was not returned. On January 28, Rosadiuk emailed Hirter requesting direct communication regarding the return of Moro's funds. Walton was upset that Rosadiuk had contacted Hirter, and defendant William Watson said that there would be administrative fees charged, including his as Administrator. Nonetheless, they assured him that the collateral would be returned.

Moro negotiated fruitlessly until April 2010 to try to get its collateral returned. But the collateral was never returned, and no funds were ever disbursed. Moro filed this suit in December 2010, bringing claims for fraud, conversion, unjust enrichment, theft, civil conspiracy, and promissory estoppel against all Defendants, for breach of fiduciary duty against William Watson, Watson & Watson, PC, and Stephan Hirter, and for breach of contract against Clarendon.

**II. Standard of Review**

3

Fed.R.Civ.P. 12(b)(6) provides for dismissal of a lawsuit for "failure to state a claim upon which relief can be granted." The court must accept as true all of the factual allegations contained in the complaint when ruling on a motion to dismiss. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). To survive dismissal, a complaint must contain enough factual material to state a claim "that is plausible on its face." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1949 (2009). Conclusory allegations or legal conclusions masquerading as factual allegations will not suffice. *Bell Atlantic v. Twombly*, 550 U.S. 544, 555 (2007). Nor is it enough for the complaint to state facts that are "merely consistent with a defendant's liability." *Iqbal*, 129 S.Ct. at 1949. Rather, the complaint's "factual allegations must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true.'" *Ass'n of Cleveland Fire Fighters v. City of Cleveland*, *Ohio*, 502 F.3d 545, 548 (6th Cir. 2007) (quoting *Twombly*, 550 U.S. at 555).

The term "plausible," as used in *Twombly* and *Iqbal*, is to be understood in a peculiarly narrow sense, and does not refer to the likelihood that the plaintiff will be able to prove a particular allegation. See *Iqbal*, 129 S.Ct. at 1951 ("To be clear, we do not reject these bald allegations on the ground that they are unrealistic or nonsensical."); *Twombly*, 550 U.S. at 556 ("[A] well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of those facts is improbable."). Rather, the Court meant the term to refer to the plausibility of the plaintiff's legal theories, when considered in light of the factual allegations in the complaint.

**III. Discussion**

*A. Motions to Strike*

Thus far in this litigation, Defendant Clarendon has filed a motion to dismiss (Doc. 9) and an Answer (Doc. 18) to defendant Lorena Harvey's cross-claims. Plaintiff moves to strike these

4

filings on the ground that they are not signed by a licensed attorney. This argument is well-taken. "It has been the law for the better part of two centuries . . . that a corporation may appear in federal courts only through licensed counsel." *Rowland v. California Men's Colony*, 506 U.S. 194, 201-202 (1993); see also *Doherty v. American Motors Corp.*, 728 F.2d 334, 340 (6th Cir. 1984) ("The rule of this circuit is that a corporation cannot appear in federal court except through an attorney."). Clarendon's filings are signed by its President, defendant Walton, but there is nothing indicating that he is a licensed attorney.

The Federal Rules of Civil Procedure require that "[e]very pleading, written motion, and other paper must be signed by at least one attorney of record in the attorney's name--or by a party personally if the party is unrepresented." Fed. R. Civ. P. 11(a). "The court must strike an unsigned paper unless the omission is promptly corrected after being called to the attorney's or party's attention." *Id*. Moreover, "[a] pleading by a corporation that is not signed by an attorney is treated as unsigned for Rule 11(a) purposes." *White v. Smith, Dean & Assocs., Inc.*, 2010 WL 795967 (S.D. Ohio Mar. 2, 2010).

Plaintiff's motion to strike Clarendon's motion to dismiss was served on Clarendon on March 10, 2011 (Doc. 10 at 5), and its motion to strike Clarendon's Answer was served on May 13, 2011 (Doc. 20 at 6). These filings sufficed to call the matter to Clarendon's attention, Clarendon has done nothing to correct the situation in a prompt manner. Therefore, Plaintiff's motions to strike are granted, and Clarendon's motion to dismiss (Doc. 10) and Answer (Doc. 18) will be stricken.

***B. Sufficiency of the Complaint***

5

Defendants Walton and Keith move to dismiss on several grounds. They argue that the Complaint should be dismissed as a sanction, or Plaintiff required to file a more definite statement, because Plaintiff's Complaint (Doc. 1) is too long and complicated. Under Fed. R. Civ. P. 8(a), "[a] pleading that states a claim for relief must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." But, Walton and Keith contend, "the complaint, by virtue of both its detail and the inappropriateness of its many unnecessary attached exhibits, and by its incorporation of all prior paragraphs into each count, cannot reasonably be considered 'a short and plain statement' as required by the rule." (Doc. 7 at 4; Doc. 8 at 2).

This argument is not well-taken. Upon review, the Court finds that the Complaint is not unduly lengthy or complex.

Walton and Keith also contend that the Complaint should be dismissed pursuant to Fed. R. 12(b)(6) for failure to state a claim upon which relief can be granted. The Court disagrees. Accepting the allegations of the Complaint as true, it contains adequate factual material to support the claims for relief set forth therein.

### *C. Personal Jurisdiction as to Walton*

Walton also moves to dismiss on personal jurisdiction grounds. It is Plaintiff's burden to make a prima facie showing that this Court has personal jurisdiction over Walton. *Hunter v. Mendoza*, 197 F.Supp.2d 964, 967 (N.D. Ohio 2002). Since the Court has not held an evidentiary hearing on Walton's personal jurisdiction motion, the Court must construe the pleadings in a light most favorable to the plaintiff. *CompuServe v. Patterson*, 89 F.3d 1257, 1262 (6th Cir. 1996). Moreover, the Court does not weight the controverting assertions of the party seeking dismissal. *Id*. In order for the Court to assert personal jurisdiction over a defendant, "the defendant must be

amenable to suit under the forum state's long-arm statute and the due process requirements of the Constitution must be met." *Reynolds v. International Amateur Athletic Federation*, 23 F.3d 1110, 1115 (6th Cir. 1994).

According to the Complaint, Walton is a resident of Florida, and his company, Clarendon, is a Florida corporation. Moreover, Plaintiff is conceded to be an Alaska corporation. There is no allegation in this case that Walton ever set foot in Ohio. Indeed, the Funding Agreement provides that "[t]his agreement shall be governed by, and construed in all respects in accordance with, the laws of the State of **FLORIDA** and the United States of America." (Doc. 1, Exh. S at 7) (emphasis in original).

Plaintiff contends that the Court has personal jurisdiction over Walton because of his ties to Keith, who is an Ohio resident. According to Plaintiff, the email, telephone, and facsimile communications between Walton and Keith suffice to establish personal jurisdiction in Ohio. The Court disagrees.

Ohio's long-arm statute permits jurisdiction over a defendant where the cause of action arises from a defendant's "[t]ransacting any business in [Ohio]". Ohio Rev. Code § 2307.382(A)(1). As interpreted by the Ohio courts, "the broad wording of the statute permits jurisdiction over non-resident defendants who are transacting any business in Ohio." *Kroger Co. v. Malease Foods Corp.*, 437 F.3d 506, 511 (6th Cir. 2006). The phrase "transact" means "to *prosecute negotiations*; to carry on business; *to have dealings*." *Id*. (quoting *Kentucky Oaks Mall v. Mitchell's Formal Wear*, 53 Ohio St.3d 73, 75 (1990) (emphasis in original). Under Ohio law, "personal jurisdiction does not require physical presence in the forum state." *Goldstein v. Christiansen,* 70 Ohio St.3d 232, 236 (1994).

7

But the causes of action in this case do not arise from Walton's "transacting any business" in Ohio. Here, Walton did not directly establish business dealings in Ohio or with an Ohio-based company, but rather established dealings in Florida with an Alaska-based firm. While it is true that Walton solicited that business through the Ohio-based Keith, a non-resident's mere solicitation of business in Ohio does not suffice for purposes of Ohio's long-arm statute. *Mustang Tractor & Equip Co. v. Sound Envtl. Serv., Inc.*, 727 N.E. 977, 981 (Ohio Com.Pl.1999).

Plaintiff also claims that the Ohio long-arm statute reaches Walton because its claims arise from Walton's "[c]ausing tortious injury by an act or omission in this state." Ohio Rev. Code § 2307.382(A)(3). But the Complaint does not allege that Walton acted or failed to act in Ohio. See *Weller v. Cromwell Oil Co.*, 504 F.2d 927, 930 (6th Cir. 1974) ("Under [Ohio's long-arm] statute the tortious act causing the injury must be committed in Ohio.").

Plaintiff contends, however, that Walton falls within the reach of Ohio's long-arm statute because Keith was acting as his agent, and his actions are therefore attributable to Walton. Under Ohio law, agency is a fiduciary relationship which results from (1) manifestation of consent by one person to another that the other; (2) shall act on his behalf; and (3) subject to his control; and (4) consent by the other so to act. *Berge v. Columbus Cmty. Cable Access*, 136 Ohio App.3d 281, 301 (1999) (citing Restatement (Second) of Agency § 1 (1958)). But Plaintiff points to no factual allegations in the Complaint, and the Court can find none, plausibly indicating that Keith was acting as Walton's agent in his dealings with Plaintiff.

Even assuming that Walton falls within the reach of Ohio's long-arm statute, however, this Court's exercise of personal jurisdiction over Walton would not comply with federal Due Process standards. The constitutional concept of Due Process "requires only that in order to subject a

8

defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). The Sixth Circuit has interpreted the "minimum contacts" test to require: 1) that the defendant "purposefully avails" himself of the privilege of acting in the forum state; 2) that the cause of action arise from the defendant's activities in the forum state; and 3) that the activities of the defendant be substantial enough in the forum state to make the exercise of jurisdiction reasonable. *Reynolds*, 23 F.3d at 1116. It is not enough to show that a defendant has contacts with other defendants over whom the Court has personal jurisdiction, for "[p]ersonal jurisdiction must be established over each defendant independently." *Hunter*, 197 F.Supp.2d at 971-972.

**1. "Purposeful Availment"**

The "purposeful availment" requirement is satisfied when the defendant's contacts create a "substantial connection" with the forum state such that the defendant "should reasonably anticipate being haled into court there." *CompuServe Inc. v. Patterson*, 89 F.3d 1257, 1263 (6th Cir. 1996) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474-75 (1985), and *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)). The purposeful availment requirement "ensures that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts, or of the unilateral activity of another party or a third person." *Burger King*, 471 U.S. at 475 (internal quotation marks and citations omitted).

In this case, the Court cannot find that Walton "purposely availed" himself of an Ohio forum. By Plaintiff's own admission, Walton's only dealings with Ohio were "via email, telephone, and facsimile." (Doc. 15 at 10). But "the use of interstate facilities such as the

9

telephone and mail is a secondary or ancillary factor and cannot alone provide the minimum contacts required by due process." *Reynolds*, 23 F.3d at 1119 (internal quotation marks omitted). Moreover, the relevant email, telephone, and facsimile contacts at issue were not directed towards Ohio, but to an Alaska corporation; the only tie to Ohio was that an Ohio resident, Keith, was copied on many of them.[1]

Thus, Walton's contacts did not create a "substantial connection" with Ohio, and he could not have reasonably anticipated being haled into court here.

**2. "Arising From"**

As to the "arising from" requirement, the Sixth Circuit has said that "[i]f a defendant's contacts with the forum state are related to the operative facts of the controversy, then an action will be deemed to have arisen from those contracts." *CompuServe*, 89 F.3d at 1267. In this case, Walton's contacts with Ohio do not relate to the operative facts of the controversy, as Walton's allegedly wrongful conduct occurred in Florida.

**3. Reasonableness**

Determining whether the exercise of personal jurisdiction is "reasonable" involves a balancing of three factors: "the burden on the defendant, the interests of the forum State, and the plaintiff's interest in obtaining relief." *City of Monroe Employees Ret. Sys. v. Bridgestone*, 399 F.3d 651, 666 (6th Cir.2005) (quoting *Asahi Metal Indus. Co. v. Superior Court of Calif.*, 480 U.S. 102, 113 (1987)). In this case, the Court finds that weighing the relevant factors indicates that

---

[1] The Court notes that the Sixth Circuit does not recognize the "conspiracy theory of jurisdiction," in which the contacts of a defendant's co-conspirators with the forum state are attributed to the defendant in order to supply the minimum contacts necessary for personal jurisdiction. *Hollar v. Philip Morris Inc.*, 43 F.Supp.2d 794, 802 n. 7 (N.D. Ohio 1998).

exercising of personal jurisdiction over Walton in this case would not be reasonable. While there is nothing in the record at present as to the burden on Walton in litigating in Ohio, Ohio's interest in this suit is slight, as Plaintiff is an Alaska corporation, and only one of the eight defendants is from Ohio. Moreover, Florida stands a reasonable alternative forum in which Plaintiff may pursue its claims against Walton.

For the foregoing reasons, the Court finds it lacks personal jurisdiction over Walton, and the claims against him are dismissed without prejudice.

### *D. Venue as to Keith*

Defendant Keith contends that venue is improper in the Northern District of Ohio. Pursuant to the federal venue statute, a civil action wherein jurisdiction is founded only on diversity of citizenship (as this one is) may be brought in:

> (1) a judicial district where any defendant resides, if all defendants reside in the same State,
> (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or
> (3) a judicial district in which any defendant is subject to personal jurisdiction at the time the action is commenced, if there is no district in which the action may otherwise be brought.

28 U.S.C. § 1391(a).

In this case, venue is proper as to Keith because he is a resident of Ohio, and he admits that the relevant contacts that give rise to Plaintiff's claims against him occurred in Ohio. See Doc. 7 at *¶* 24.

### *E. Arbitration as to Keith*

Keith also moves to compel arbitration as to the claims against him. In support, he cites the following clause in the Funding Agreement:

11

> **17.0 Arbitration**
>
> If a dispute arises out of, or, relates to this contract, or the breach thereof, and the dispute cannot be mutually settled through negotiation, the parties agree in good faith to settle the dispute by mediation administered by Arbitration under the Rules of the AMERICAN ARBITRATION ASSOCIATION by one or more Arbitrators appointed in accordance with said Rules and, both party [sic] hereby agrees that any and all ruling [sic] arising from this Arbitration will be endorsed and accepted.

(Doc. 1, Exh. S.).

The Federal Arbitration Act makes any "written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract . . . valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Pursuant to 9 U.S.C. § 3,

> If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement.

"An arbitration agreement may be invalidated for the same reasons for which any contract may be invalidated, including forgery, unconscionability, and lack of consideration." *Fazio v. Lehman Bros., Inc.*, 340 F.3d 386, 393 (6th Cir. 2003). "Ordinary state-law principles that govern the formation of contracts" are controlling in this analysis. *Id*. at 694 (internal quotation marks and formatting omitted). "Before compelling an unwilling party to arbitrate, the court must engage in a limited review to determine whether the dispute is arbitrable; meaning that a valid agreement to arbitrate exists between the parties and that the specific dispute falls within the substantive scope of that agreement." *Javitch v. First Union Securities, Inc.*, 315 F.3d 619, 625 (6th Cir. 2003).

The party challenging the validity of an arbitration agreement bears the burden of establishing its invalidity. *Green Tree Financial Corp.-Alabama v. Randolph*, 531 U.S. 79, 89-91

12

(2000). Arbitration clauses are to be construed liberally, and "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 24 (1983). Indeed, "any doubts are to be resolved in favor of arbitration unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Nestle Waters North America, Inc. v. Bollman*, 505 F.3d 498, 504 (6th Cir. 2007) (internal quotation marks omitted).

Plaintiff contends that, because Keith is not a party to the Funding Agreement, he lacks standing to enforce the arbitration clause. The Court disagrees. The Sixth Circuit has approved of the framework set out in *Thomson-CSF v. Am. Arbitration Ass'n*, 64 F.3d 773, 776 (2d Cir. 1995) when a non-signatory seeks to compel arbitration. See *Javitch*, 315 F.3d at 629. *Thomson-CSF* acknowledged that "the circuits have been willing to estop a *signatory* from avoiding arbitration with a nonsignatory when the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed." 64 F.3d at 779 (emphasis in original). Therefore,

> [E]quitable estoppel applies when the signatory to a written agreement containing an arbitration clause "must rely on the terms of the written agreement in asserting [its] claims" against the nonsignatory. When each of a signatory's claims against a nonsignatory "makes reference to" or "presumes the existence of" the written agreement, the signatory's claims "arise[] out of and relate[] directly to the [written] agreement, and arbitration is appropriate.

*Liedtke v. Frank*, 437 F.Supp.2d 696, 699 (N.D. Ohio 2006) (quoting *MS Dealer Serv. Corp. v. Franklin*, 177 F.3d 942, 947 (11th Cir. 1999) (internal citations omitted).

In this case, the arbitration clause in the Funding Agreement (which was signed by Plaintiff) broadly covers any dispute that "arises out of" or "relates to" the contract. Although Plaintiff contends that the terms of the arbitration clause do not reach tort claims, the Court finds

13

otherwise. But "merely casting a complaint in tort does not mean that the arbitration provision does not apply," *Fazio*, 340 F.3d at 395, and "[e]ven real torts can be covered by arbitration clauses if the allegations underlying the claims touch matters covered by the agreement." *Id*. (internal quotation marks omitted). In this case, Plaintiff's tort claims, like its contract claims, "presume the existence of" the Funding Agreement, and "touch matters covered by the agreement." Plaintiff's claim for theft, for example, is covered, as it relates to Plaintiff's posting of collateral pursuant to the terms of the Funding Agreement. See *Fazio*, 340 F.3d at 395 (holding that claims for theft could not be maintained without reference to agreements containing arbitration clauses because "[t]he lawsuit by necessity must describe why [the defendant] was in control of the plaintiffs' money.")

Plaintiff also contends that the arbitration clause is ambiguous, because it refers to "mediation administered by Arbitration under the Rules of the American Arbitration Association." But, Plaintiff argues, the Rules of the American Arbitration Association do not provide for "mediation administered by Arbitration." The Court does not find this argument persuasive. The arbitration clause clearly intends this language to refer to "Arbitration under the Rules of the American Arbitration Association," not some undefined "mediation" process. The Court finds that Plaintiff is estopped from avoiding arbitration, and that the dispute between the parties falls within the scope of the arbitration clause.

Plaintiff contends that the arbitration clause is invalid because it is contained in a contract of adhesion that was negotiated by a party with superior bargaining power. Plaintiff does not elaborate on the basis for this argument, other than noting that the contract was drafted by Clarendon, and Plaintiff was told that it was not subject to negotiation. But "an unequal

14

bargaining position is not, in and of itself, a sufficient reason in law or equity to hold [an] arbitration agreement unenforceable." *Stachurski v. DirecTV, Inc.*, 642 F.Supp.2d 758, 768 (N.D. Ohio 2009) (quoting *Hawkins v. O'Brien*, 2009 WL 50616 at *4 (Ohio Ct.App. Jan. 9, 2009). Instead, "there must be some evidence that, in consequence of the imbalance, the party in the weaker position was defrauded or coerced into agreement to the arbitration clause." *Id*. Plaintiff submits no evidence on this point, and there is nothing in the Complaint indicating that Plaintiff was defrauded or coerced into agreeing to the arbitration clause. Therefore, the Court finds that the arbitration clause is valid.

**IV. Conclusion**

For the foregoing reasons, Plaintiff's motions to strike (Docs. 10 & 20) are granted, and Clarendon's motion to dismiss (Doc. 9) and Answer (Doc. 18) are stricken. Walton's motion to dismiss (Doc. 8) is granted in part, and the claims against him are dismissed without prejudice for lack of personal jurisdiction. Keith's motion to dismiss (Doc. 7) is granted in part, and the Court compels arbitration as to the claims against him. The claims against Keith are stayed pending the completion of arbitration.

IT IS SO ORDERED.

                                                           s/ *David A. Katz*
                                                           DAVID A. KATZ
                                                           U. S. DISTRICT JUDGE